# FOR PUBLICATION

## UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

JAMES F. SMALL, Regional Director
of Region 21 of the National
Labor Relations Board for and on
behalf of the National Labor
Relations Board; NATIONAL LABOR
RELATIONS BOARD,
              *Plaintiffs-Appellees,*

v.

OPERATIVE PLASTERERS' AND
CEMENT MASONS' INTERNATIONAL
ASSOCIATION LOCAL 200, AFL-CIO,
              *Defendant-Appellant.*

No. 08-56668

D.C. No.
5:08-cv-01039-
SGL-OP

JAMES F. SMALL, Regional Director
of Region 21 of the National
Labor Relations Board for and on
behalf of the National Labor
Relations Board,
              *Plaintiff,*

and

NATIONAL LABOR RELATIONS
BOARD,
              *Plaintiff-Appellant,*

v.

OPERATIVE PLASTERERS' AND
CEMENT MASONS' INTERNATIONAL
ASSOCIATION LOCAL 200, AFL-CIO,
              *Defendant-Appellee.*

No. 08-56942

D.C. No.
5:08-cv-01039-
SGL-OP

OPINION

Appeals from the United States District Court
for the Central District of California
Stephen G. Larson, District Judge, Presiding

Argued and Submitted
February 4, 2009—Pasadena, California.

Filed July 8, 2010[1]

Before: Harry Pregerson, Susan P. Graber, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Wardlaw

---

[1]By separate order, we have withdrawn our earlier memorandum disposition, which we replace with this opinion.

## COUNSEL

John J. Davis, Jr., Paul L. More, Davis, Cowell & Bowe LLP, San Francisco, California, for the defendant-appellants.

Ronald Meisburg, John E. Higgins, JR., Barry J. Kearney, Judith I. Katz, Steven L. Sokolow, Richard J. Lussier, National Labor Relations Board, Washington, D.C., for the appellee.

Stephen J. Schultz, Mark T. Bennett, Marks, Golia & Finch LLP, San Diego, California, for the amicus curiae.

## OPINION

WARDLAW, Circuit Judge:

This appeal arises from a dispute between two unions over the right to perform certain plastering work as subcontractors for contractor Standard Drywall, Inc. ("SDI"). The National Labor Relations Board (the "Board") awarded the work to the Southwest Regional Council of Carpenters, United Brotherhood of Carpenters and Joiners of America ("the Carpenters"), whereupon the other union, Operative Plasterers' and Cement Masons' International Association, Local 200, AFL-CIO ("Local 200"), filed two state court lawsuits against SDI,

alleging (1) violation of wage and hour laws; and (2) tortious interference with contract. James F. Small, the Regional Director of Region 21 of the Board ("Regional Director") lodged a complaint with the Board, charging that the two state lawsuits are unlawful under the National Labor Relations Act ("NLRA" or the "Act") because they seek to coerce SDI to reassign the plastering work to Local 200. The Regional Director then sought and was awarded a preliminary injunction against Local 200 to halt the state court proceedings pending the Board's final determination as to their legality under the Act. We must decide whether the district court abused its discretion in enjoining the state court proceedings and, if not, whether the district court had subject matter jurisdiction to modify the injunction after the notice of appeal was filed. We affirm the entry of the preliminary injunction, but reverse the district court's order modifying the injunction.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

In the early 1930s, Congress declared that "the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment." 29 U.S.C. § 102. Our nation's labor laws protect employees' rights to organize in unions and to bargain collectively. *See NLRB v. Am. Nat'l Ins. Co.*, 343 U.S. 395, 401-02 (1952); *see also* 29 U.S.C. §§ 157, 158. And although the "National Labor Relations Act is designed to promote industrial peace by encouraging the making of voluntary agreements governing relations between unions and employers," *Am. Nat'l Ins. Co.*, 343 U.S. at 401-02, sometimes, unions must disturb the peace to fight for their members' interests, *see NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 489 (1960) ("The presence of economic weapons in reserve, and their actual exercise on occasion by the parties, is part and parcel of the system . . . ."). After all, the very purpose of labor unions is to advocate zealously for their members. This appeal marks the latest round in a long and protracted fight

between two unions over plastering work in Southern California.

In March 2004, SDI, a construction contractor, was retained to oversee the plastering work on a Fine Arts Project at the California State University campus in Fullerton, California. There was much work to be done, including all interior and exterior plastering, bonding of all the ceilings and walls, waterproofing of all the plaster, adhering ornamentation to the walls, and installing insulation. SDI needed a subcontractor to do the work, and two competing labor unions wanted the job: the Carpenters and Local 200. In March 2004, SDI entered into a subcontract with the Carpenters, with whom SDI had enjoyed a collective bargaining relationship since the mid-1990s. At that point, the gloves came off, and the unions' fight for their members' rights to the work was on.

## A.   State Court Litigation and 10(k) Hearings

Local 200 threw the first punch. At the time, Local 200 operated the only state-approved apprenticeship program. In October 2004, it filed suit against SDI in Los Angeles County Superior Court, alleging that SDI violated California Labor Code § 1777.5 by failing to employ plastering apprentices on public works projects, and that SDI violated wage and hour laws on past, present, and future public works projects ("the Wage and Hour Lawsuit"). Local 200 sought payment of wages lost from SDI's failure to employ its members on public works projects and an injunction against further violations. In May 2005, Local 200 representatives offered to dismiss the Wage and Hour Lawsuit if SDI would sign an agreement assigning Local 200 the disputed plastering work. SDI relented, agreeing to reassign some of the plastering work from the Carpenters to Local 200.

The Carpenters hit back. They threatened to strike SDI if SDI went ahead with its plan to reassign some of the disputed work to Local 200. To prevent a strike, SDI filed a charge

with the Board, alleging that the Carpenters' threatened strike was an unfair labor practice under the NLRA. 29 U.S.C. § 158(b)(4)(ii)(D). That section makes it an "unfair labor practice" for a labor organization

> to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is— . . . (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft or, class . . . .

*Id.* The Board was authorized "to hear and determine the dispute" pursuant to section 10(k) of the NLRA. 29 U.S.C. § 160(k).

The Board concluded that there was "reasonable cause to believe that the Carpenters used proscribed means to enforce its claim to the work in dispute." Acting pursuant to its section 10(k) authority, the Board assigned the work to the Carpenters, finding that it had a collective bargaining agreement with SDI; that SDI preferred that the Carpenters perform the work; that area and industry practice weighed in favor of assigning the work to the Carpenters; and that the Carpenters members were sufficiently skilled to perform the work. *Sw. Reg'l Council of Carpenters (Standard Drywall, Inc.)*, 346 N.L.R.B. 478 (2006) (hereinafter "*SDI I*").

Local 200 then sought other means to secure the disputed work for its members. Following the Board's decision to award the disputed work to the Carpenters, Local 200 notified SDI that it would drop the Wage and Hour Lawsuit as to the Fine Arts Project, but insisted on prosecuting the suit as to all other public works projects. With its back against the wall, SDI wrote to the Carpenters explaining that SDI "may have no choice but to assign plastering work to employees repre-

sented by [Local 200] on projects on the enclosed list and on any new projects in Southern California." The list set forth the projects which SDI determined were the subject of Local 200's lawsuit. The letter also requested that the Carpenters inform SDI of its position should SDI assign plastering work to members of Local 200.

The Carpenters wrote back, informing SDI that if it "attempts to reassign any work currently being performed by members of the Carpenters Union, [it would] immediately strike the Company." In February 2006, SDI filed another unfair labor practice charge against the Carpenters, once again alleging that the Carpenters' threat to strike violated the NLRA. As in the first 10(k) proceeding, the Board found that both the Carpenters and Local 200 laid claim to disputed work —in this case, all current and future public works projects constructed by SDI in twelve California counties. The Board again considered the parties' previous relationships with one another, the unions' skills and experience, area and industry practice, and other relevant factors, and "conclude[d] that employees represented by Carpenters are entitled to perform the work in dispute." *Sw. Reg'l Council of Carpenters (Standard Drywall, Inc.)*, 348 N.L.R.B. 1250, 1255 (2006) (hereinafter "*SDI II*").

Despite the Board's second adverse 10(k) determination, Local 200 fought on. It again amended its complaint in the Wage and Hour Lawsuit, this time to include claims on behalf of a class of plastering apprentices enrolled in Local 200's state-approved apprenticeship program which sought lost wages due to SDI's failure to employ its members on public works projects. The amended complaint also sought an injunction against further violations. In addition, Local 200 filed another state lawsuit in Los Angeles County Superior Court, alleging that SDI and the Carpenters tortiously interfered with Local 200's economic advantage in its relationships with plastering subcontractors (the "Tortious Interference Lawuit"). Local 200 sought damages for work

that its members lost as a result of an alleged kickback scheme between SDI and the Carpenters, and requested an injunction against further kickbacks. In June 2008, the Los Angeles County Superior Court dismissed the Tortious Interference Lawsuit, concluding that it was preempted by the NLRA. Local 200 appealed that ruling, which was stayed pending resolution of the Board proceedings.

## B. National Labor Relations Board Proceedings

At this point, the Regional Director filed a complaint with the Board, alleging that Local 200 committed an unfair labor practice by filing the Wage and Hour and Tortious Interference Lawsuits because Local 200's objective was unlawful. The Regional Director asserted that the true objective of the suits was to force SDI to reassign its plastering work to Local 200 in violation of 29 U.S.C. § 158(b)(4)(ii)(D). The Regional Director, as an agent of the Board, 29 C.F.R. § 102.5, is authorized to file complaints with the Board when it appears that an unfair labor practice charge has merit. *See* 29 C.F.R. §§ 102.15, 102.74. Complaints are heard by an administrative law judge ("ALJ"), who makes findings of fact, conclusions of law, and "recommendations as to what disposition of the case should be made" by the Board. 29 C.F.R. § 102.45(a).

The ALJ conducted a hearing on the Regional Director's Complaint; found that Local 200 committed an unfair labor practice by prosecuting the two state court lawsuits, which had unlawful objectives; and recommended that the Board order Local 200 to withdraw the two lawsuits. As to the Wage and Hour Lawsuit, the ALJ found that "Local 200's ongoing pursuit of [it] . . . is aimed at achieving the unlawful objective of coercing SDI into assigning plastering work to Local 200 represented employees." As to the Tortious Interference Lawsuit, the ALJ found that the suit's "effect is to cause SDI to assign work to Local 200" and that "[t]his is coercive conduct."

## C. District Court Proceedings

In August 2008, while the Board was considering the ALJ's recommendation, the Regional Director petitioned the United States District Court for the Central District of California for injunctive relief pursuant to section 10(*l*) of the NLRA. Section 10(*l*) permits a district court to grant injunctive relief pending the Board's resolution of charges alleging unfair labor practices.[2] 29 U.S.C. § 160(*l*). The petition requested only that the district court temporarily enjoin the continued prosecution of the two state court lawsuits pending the Board's review of the ALJ's 2008 decision.

The district court granted the petition on September 15, 2008, concluding that temporary injunctive relief was appropriate. The district court held that the Regional Director "has established a likelihood of success on the merits; i.e., that he will be able to establish that the state court actions have been filed and prosecuted to accomplish an objective that is unlawful under 29 U.S.C. § 158(b)(4)(ii)(D)." Relying on our decision in *Miller ex rel. NLRB v. California Pacific Medical Center*, 19 F.3d 449, 460 (9th Cir. 1994) (en banc), the court "presumed the second element of irreparable injury" based on its conclusion that the Regional Director had established the

---

[2]Section 10(*l*) of the NLRA, 29 U.S.C. § 160(*l*), provides: "Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 158(b) of this title . . . the preliminary investigation of such charge shall be made forthwith . . . . If, after such investigation, the officer . . . has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred . . . for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief . . . as it deems just and proper, notwithstanding any other provision of law . . . . In situations where such relief is appropriate the procedure specified herein shall apply to charges with respect to section 158(b)(4)(D) of this title."

requisite likelihood of success. The district court found that the balance of the hardships weighed against Local 200, and that the public interest would be served by granting the preliminary injunction.

Accordingly, on September 30, 2008, the district court enjoined Local 200 from prosecuting the two state court lawsuits pending final disposition by the Board of the Regional Director's petition. The injunction included paragraph 1(c), which prohibited Local 200 from attempting "in any manner or by any means" to "force or require" SDI to assign plastering work in the twelve Southern California counties to Local 200's members. Following its timely filing of the notice of appeal of the injunction, Local 200 moved for a modification of the injunction to eliminate the broadly worded prohibition in paragraph 1(c). The district court granted the motion by striking paragraph 1(c) but, questioning its jurisdiction to do so while the order was on appeal, it alternatively stayed enforcement of the prohibition. The Regional Director cross-appeals as to the modification order.

## II.  STANDARD OF REVIEW

We review the district court's grant of an injunction pursuant to section 10(l) for abuse of discretion. *See Overstreet ex rel. NLRB v. United Bhd. of Carpenters & Joiners of Am., Local 1506*, 409 F.3d 1199, 1204 (9th Cir. 2005). The district court abuses its discretion if it relies on a clearly erroneous finding of fact or an erroneous legal standard. *Id.* We review de novo the legal standards applied by the district court. *Id.*

## III.  DISCUSSION

### A.  Order Granting Preliminary Injunctive Relief

#### 1.  *The Appropriate Standard for Granting Injunctive Relief Under Section 10(l)*

[1] A district court may grant a section 10(*l*) injunction if it is "just and proper." *Overstreet*, 409 F.3d at 1206. It is well

established that, to determine whether an injunction is "just and proper," courts apply the "familiar set of four equitable factors: the movant's likelihood of success on the merits; the possibility of irreparable injury to the moving party; the extent to which the balance of hardships favors each party; and whether the public interest will be advanced by granting the preliminary relief." *Id.* at 1207. The parties do not dispute the applicability of these factors, but disagree on the stringency with which they are to be applied. The Regional Director argues that, under our decision in *Miller*, courts apply the factors with deference to the Board. Under *Miller*'s deferential standard, a likelihood of success is established if the Board produces "some evidence to support the unfair labor practice charge, together with an arguable legal theory," and once a likelihood of success is established, district courts are required to "presume irreparable injury." *Miller*, 19 F.3d at 460. In contrast, Local 200 argues that its lawsuits are protected by the First Amendment's Petition Clause and that, therefore, our decision in *Overstreet* requires a "particularly strong showing of likely success, and of harm." *Overstreet*, 409 F.3d at 1208 n.13. We reject each party's characterization of the proper standard. Rather, the preliminary injunction standard articulated by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, ___ U.S. ___, 129 S. Ct. 365 (2008)—requiring neither deference nor particular stringency—applies. Under *Winter*, a party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 374.

**[2]** In *Miller*, the Board petitioned the district court for injunctive relief under section 10(j) of the NLRA. Like section 10(*l*), section 10(j) grants the district court jurisdiction to enter injunctive relief if it is "just and proper." *See* 29 U.S.C. §§ 160(j), (*l*). Accordingly, the same equitable factors applicable to requests for section 10(j) injunctions apply to

requests for section 10(*l*) injunctions. *See Overstreet*, 409 F.3d at 1207. Unlike section 10(*l*) petitions, which are filed by regional directors and are mandatory, 29 U.S.C. § 160(*l*), section 10(j) petitions are filed by the Board and are discretionary, *id.* § 160(j). Because *Miller* involved a section 10(j) petition, we held that, "[w]hile the district court is not required to defer to the Board in deciding whether interim relief is 'just and proper,' it should evaluate the probabilities of the complaining party prevailing in light of the fact that ultimately, the Board's determination on the merits will be given considerable deference." *Miller*, 19 F.3d at 460. We therefore concluded that "the Board can make a threshold showing of likelihood of success by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory," and, if a likelihood of success is established, "presume irreparable injury." *Id.*

In *Winter*, however, the Supreme Court rejected *Miller*'s deferential standard for granting preliminary injunctions. Subsequently, in *McDermott ex rel. NLRB v. Ampersand Publishing, LLC*, we noted that "[o]ur now defunct precedents had provided that when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary injunction may be entered based only on a 'possibility' of irreparable harm." 593 F.3d 950, 957 (9th Cir. 2010). We recognized that the *Winter* Court rejected our more lenient standard and held "that a party seeking a preliminary injunction 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.' " *Id.* (quoting *Winter*, 129 S. Ct. at 374). The *Winter* Court reasoned that the issuance of a preliminary injunction based only on the possibility of irreparable harm is inconsistent with the extraordinary nature of the remedy. 129 S. Ct. at 375-76. We have since held that, "[t]o the extent that our cases have suggested a lesser standard, they are no longer controlling, or even viable." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046,

1052 (9th Cir. 2009) (footnote omitted); *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) ("In *Winter*, the Supreme Court definitively refuted our 'possibility of irreparable injury' standard, stating 'the Ninth Circuit's "possibility" standard is too lenient.' " (quoting *Winter*, 129 S. Ct. at 375)). Therefore, we reject the *Miller* deferential standard urged by the Regional Director.[3] *See McDermott*, 593 F.3d at 957.

Unlike *Miller*, *Overstreet* remains good law following the *Winter* decision, *McDermott*, 593 F.3d at 958. Local 200 argues that *Overstreet*'s heightened standard applies because enjoining the prosecution of its state court lawsuits constitutes a prior restraint in violation of the First Amendment's Petition Clause. We disagree. In *Overstreet*, we cautioned that "ordinary principles of deference to Board interpretation of the Act do not apply" where "there is at least some risk that constitutionally protected speech will be enjoined." 409 F.3d at 1207, 1208 n.13. If such a risk exists, "only a particularly strong showing of likely success, and of harm to the defendant as well, could suffice" to justify issuing the requested injunction. *Id.* at 1208 n.13.

[3] The First Amendment provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to

---

[3]Even if *Miller* had remained good law after *Winter*, it is doubtful that it would apply here because *Miller* involved a section 10(j) injunction. We observed in *Overstreet* that "[i]t is unclear whether *Miller*'s incorporation of a deference principle applies to a § 10(*l*) case." 409 F.3d at 1207 n.12. Unlike the decision to file a section 10(j) petition for injunctive relief—which is the Board's, 29 U.S.C. § 160(j)—the decision to file a section 10(*l*) petition is made by the Regional Director "on behalf of the board," 29 U.S.C. § 160(*l*). Therefore, although "[o]ne might presume from the Board's decision to file a § 10(j) petition that if the facts are found to be as projected in the petition, the Board will decide the case consistently with the petition," "the filing of a § 10(*l*) petition . . . suggests nothing about how the Board will ultimately resolve the case." *Overstreet*, 409 F.3d at 1208 n.12. Accordingly, we see no reason why *Miller*'s deference principles would apply to a section 10(*l*) case.

petition the Government for a redress of grievances." U.S. Const. amend I. The right to petition the government extends to the courts and, thus, includes the right to file certain lawsuits. *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002). In the NLRA context, the Supreme Court has explained that "[t]he filing and prosecution of a well-founded lawsuit may not be enjoined as an unfair labor practice, even if it would not have been commenced but for the plaintiff's desire to retaliate against the defendant for exercising rights protected by the Act." *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 743 (1983). Therefore, a retaliatory motive alone does not support the injunction of a state court lawsuit. However, in *Bill Johnson's*, the Court also recognized that a suit that "has an objective that is illegal" may be enjoined without violating the First Amendment. *Id.* at 737 n.5.[4]

Local 200 and the Regional Director have competing views as to the significance of the *Bill Johnson's* decision. Local 200 argues that the Supreme Court discredited *Bill Johnson's* illegal objective exception in *BE & K*, where it held that the Board may not impose liability on an employer for its unsuccessful prosecution of a reasonably based lawsuit with a retaliatory motive. 536 U.S. 529-30. Local 200, however, misconstrues that holding as adopting the test from the antitrust context used to determine whether a lawsuit is a mere sham. In the antitrust context, only lawsuits that are both objectively baseless and subjectively intended to abuse process constitute "sham petitioning" and are therefore stripped of First Amendment protection. *See Prof. Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993) ("*PRE*"). However, as we have observed, *"BE & K* left open the question whether a similar two-part test would apply in the labor relations context." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 938 (9th Cir. 2006). Indeed, Justice Scalia's

---

[4]The *Bill Johnson's* Court also held that lawsuits that are preempted by federal law are not protected by the First Amendment's Petition Clause. That aspect of the *Bill Johnson's* decision is not at issue in this appeal.

concurrence in *BE & K* acknowledges that the *BE & K* majority did not actually adopt the antitrust standard. 536 U.S. at 537 (Scalia, J., concurring). Therefore, *Bill Johnson's*'s holding that a lawsuit that has an illegal objective constitutionally may be enjoined was left undisturbed by *BE & K. See Sosa*, 437 F.3d at 938; *Can-Am Plumbing, Inc. v. NLRB*, 321 F.3d 145, 151 (D.C. Cir. 2003) ("*BE & K* did not affect the footnote 5 exemption in *Bill Johnson's*.").

**[4]** The critical question is thus whether Local 200's state actions have an illegal objective. The *Bill Johnson's* decision does not provide guidance on the difference between a lawsuit with a permissible retaliatory motive and one with an illegal objective, which constitutionally may be enjoined. Since *Bill Johnson's* was decided, however, we have held that a lawsuit which, if successful, would completely undermine a section 10(k) work assignment does have an illegal objective. *Int'l Longshoremen's & Warehousemen's Union, Local 32 v. Pac. Mar. Ass'n*, 773 F.2d 1012, 1015 (9th Cir. 1985). In *International Longshoremen's*, an arbitrator awarded Local 32 members damages for work that was completed by employees represented by a different union, and that the Board already had awarded to the other union pursuant to its section 10(k) authority. *Id.* at 1014. We upheld "[t]he Board's finding of an improper desire to circumvent the section 10(k) determination" under the no-longer applicable "arbitrary and capricious" standard because "[t]he union's attempt to obtain payment for work to which it is not entitled would, if successful, completely undermine the section 10(k) work assignment." *Id.* at 1015; *see also Iron Workers Local 433*, 309 N.L.R.B. 273, 274 (1992) ("[A]llowing the losing party in a 10(k) dispute to pursue payments for work that the Board awarded to employees other than those involved in the grievance necessarily subverts the Board's 10(k) award."), *aff'd*, 46 F.3d 1143 (9th Cir. 1995). The other circuits to have decided this issue agree with our analysis. *See Local 30, United Slate, Tile & Composition Roofers v. NLRB*, 1 F.3d 1419, 1426 (3d Cir. 1993) ("[T]he pursuit of a . . . breach of

contract suit that directly conflicts with a section 10(k) determination has an illegal objective and is enjoinable as an unfair labor practice under section 8(b)(4)(ii)(D)."); *Chauffeurs, Local 776 v. NLRB*, 973 F.2d 230, 235-37 (3d Cir. 1992) (noting that a suit "prosecuted to circumvent the primary jurisdiction of the Board in deciding representational issues" has an illegal objective under *Bill Johnson's*); *Int'l Longshoremen's & Warehousemen's Union v. NLRB*, 884 F.2d 1407, 1414 (D.C. Cir. 1989) ("We think the Board reasonably concluded that [petitioner's grievance has an illegal objective], because, whatever the union's motivation and no matter how persuasive its contractual case, a union cannot force an employer to choose between a Board section 10(k) award and a squarely contrary contract claim."); *see also Int'l Union, Local 1519 v. Rockwell Int'l Corp.*, 619 F.2d 580, 584 (6th Cir. 1980) (holding that "the Board's § 10(k) determination has priority over a conflicting arbitrator's award").

**[5]** Here, because any favorable resolution of the state lawsuits would directly conflict with the Board's section 10(k) determinations, under *Local 32* and *Bill Johnson's*, Local 200's suits have an illegal objective. In the Tortious Interference Lawsuit, Local 200 alleges that the Carpenters, through an illegal kickback scheme, induced SDI to "withdraw work from Local 200's signatory contractors and instead to assign that work to [the Carpenters-represented] employees." The complaint seeks damages for work that Local 200's members lost as a result of the scheme, and an injunction against further kickbacks. The Board, however, in its second section 10(k) determination, *SDI II*, found that there was no evidence of collusion between SDI and the Carpenters and explicitly assigned to the Carpenters disputed work for all current and future public works projects performed by SDI in twelve California counties. As in *Local 32*, the Tortious Interference Lawsuit seeks damages for work the Board awarded to the prevailing union. Moreover, the central allegation of the lawsuit—that the Carpenters unlawfully induced SDI to reassign work to the Carpenters—conflicts directly with the

Board's section 10(k) finding that SDI and the Carpenters did not collude to reassign the work.

[6] The Wage and Hour Lawsuit, if successful, also would directly undercut the Board's section 10(k) determination and therefore also has an illegal objective. The current operative complaint in the Wage and Hour Lawsuit, which was filed after the Board's section 10(k) decisions, alleges that Local 200 members enrolled in state-approved apprenticeship programs and lost wages due to SDI's failure to employ them on public works projects between October 2000 and November 2006. The complaint seeks recovery of wages that would have been paid to the Local 200 members had SDI hired them. The Board, however, in its first section 10(k) determination, *SDI I*, assigned work on the Fine Arts Project to the Carpenters and that work was completed, at least in part, during the period at issue in Local 200's complaint. Therefore, the Wage and Hour Lawsuit has an illegal objective because it seeks damages for work the Board awarded to the Carpenters in its section 10(k) decision.

[7] Because Local 200's state court lawsuits have an illegal objective, they are not protected by the Petition Clause of the First Amendment. Therefore, *Overstreet*'s heightened standard for granting injunctive relief does not apply; rather, we must turn to the factors articulated in *Winter* to evaluate the propriety of injunctive relief.

## 2. *Application of the Equitable Factors*

[8] Preliminary injunctive relief is proper if the plaintiff establishes that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 129 S. Ct. at 374.

### i.   *Likelihood of Success*

We begin by examining the Regional Director's likelihood of success—that is, whether the Board will adopt the ALJ's conclusions of law. The district court concluded that the Regional Director was likely to succeed on the merits. We agree. The district court reasoned that the state court lawsuits have an illegal objective because "they seek damages and/or restitution from both SDI and Carpenters for failing to hire employees represented by [Local 200]" and that "the work at issue was awarded by the [Board], pursuant to a § 10(k) proceeding, to members represented by the Carpenters."

**[9]** We agree that it is likely that the Board will conclude that Local 200's lawsuits violate section 8(b)(4)(ii)(D) of the NLRA as an "unfair labor practice" that threatens or coerces SDI into assigning work to Local 200 members. Because any favorable resolution of the state court lawsuits would directly conflict with the Board's section 10(k) determinations, Local 200 "could not obtain the relief it sought regardless of the evidence it produced" in the state court lawsuits. *Local 776*, 973 F.2d at 236. Thus, the Board is likely to conclude that the object of both state court lawsuits is to coerce SDI to pay Local 200 for work or to assign Local 200 members work that the Board already assigned to the Carpenters, in violation of 29 U.S.C. § 158(b)(4)(ii)(D).

### ii.   *Irreparable Harm*

Unlike under the *Miller* standard, we do not presume irreparable harm; rather, applying the *Winter* standard, we ask whether the failure to issue an injunction "likely" would cause irreparable harm. *See McDermott*, 593 F.3d at 957. Although the district court did not have the benefit of the *Winter* decision, we conclude that, because its analysis "implicitly supports a likelihood of irreparable harm . . . in the absence of injunctive relief," it did not abuse its discretion in issuing the injunction. *See Johnson v. Couturier*, 572 F.3d 1067, 1084-85

(9th Cir. 2009) ("Although the validity of the district court's approach is questionable post-*Winters* [sic], . . . the district court did not abuse its discretion . . . [because its] analysis implicitly supports a likelihood of irreparable harm to Plaintiffs in the absence of injunctive relief.").

[10] We have held that "permit[ing an] allegedly unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority" is irreparable harm. *Miller*, 19 F.3d at 460. Because the likely purpose of Local 200's state court lawsuits is to circumvent the Board's section 10(k) work assignments, in the absence of an injunction, SDI would be under pressure to reassign the work to Local 200, given the hardship it is undergoing in defending the lawsuits and the legal fees it is incurring. Indeed, these tactics have proved effective in the past. When Local 200 continued to pursue litigation against SDI after the Board's first section 10(k) determination, SDI wrote to the Carpenters explaining that SDI "may have no choice but to assign plastering work" to Local 200 members. The Carpenters threatened to "immediately strike" SDI if it did so. Therefore, we agree with the necessary implication of the district court's order that the Regional Director has established a likelihood of irreparable harm.

### iii.   Balance of Hardships and the Public Interest

[11] The district court concluded that the balance of hardships and the public interest weigh in favor of granting the injunction. We agree. The only hardship to Local 200 is the delay in prosecuting lawsuits the Board likely will conclude are unlawful. This interest is weighed against the hardships to SDI and the threat of harm to the public. Here the hardship to SDI—the cost of defending the lawsuits even in the face of favorable Board determinations—implicates the public interest. If these costs force SDI to reassign the Carpenters' work to Local 200, it is likely to engender a disruption of industrial peace, causing "obstructions to the free flow of commerce," *Miller*, 19 F.3d at 455 n.3, and "threaten[ing a] danger of

harm to the public," *Retail Clerks Union, Local 137 v. Food Employers Council, Inc.*, 351 F.2d 525, 531 (9th Cir. 1965) ("Section 10(*l*) reflects a congressional determination that the unfair labor practices enumerated therein are so disruptive of labor-management relations and threaten such danger of harm to the public . . . .").

## B.   Modification of the Preliminary Injunction

**[12]**  We review de novo whether the district court had subject matter jurisdiction to modify the injunction once an appeal was taken. *Burlington N. Santa Fe Ry. Co. v. Int'l Bhd. of Teamsters Local 174*, 203 F.3d 703, 707 (9th Cir. 2000). Because "[t]he filing of a notice of appeal . . . confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal," we conclude that the district court lacked jurisdiction to modify the injunction. *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) (per curiam).

**[13]**  Though the court is allowed to "modify . . . an injunction on . . . terms that secure the opposing party's rights," Fed. R. Civ. P. 62(c), the court only "retains jurisdiction during the pendency of an appeal to act to preserve the status quo," *Natural Res. Def. Council, Inc. v. Sw. Marine, Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001). The district court deleted paragraph 1(c), which proscribed Local 200 from "in any manner or by any means, threatening, coercing, or restraining [SDI], where an object thereof is to force or require [SDI] to assign plastering work to Local 200." This modification altered the status quo by removing the prohibition on Local 200's use of other coercive measures designed to undermine the Board's section 10(k) determination pending final adjudication. We therefore vacate the modification order deleting paragraph 1(c) and reinstate the injunction as originally granted.

## IV.   CONCLUSION

Because we conclude that the district court did not abuse its discretion in granting injunctive relief, we affirm the order

appealed in Case No. 08-56668. However, because the district court lacked subject matter jurisdiction to modify the injunction once the appeal was taken, we vacate the order appealed in Case No. 08-56942, reinstating the full scope of the injunction as originally granted.

**AFFIRMED in part; VACATED in part.**